2005-NMCA-027

107 P.3d 513

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Eric Patrick MORALES, Defendant–
Appellant.**

**No. 24,061.**

Court of Appeals of New Mexico.

Dec. 28, 2004.

Certiorari Granted, No. 29,032,
Feb. 21, 2005.

74

Patricia A. Madrid, Attorney General, Santa Fe, Max Shepherd, Assistant Attorney General, Albuquerque, for Appellee.

John B. Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

CASTILLO, J.

{1} Defendant Eric Patrick Morales appeals from an order denying his motion to suppress evidence of a gun seized from his person by an officer during an investigatory stop. Defendant challenges the constitutionality of the investigatory stop and detention, asserting that the officers lacked reasonable suspicion because the stop was based on an unreliable tip from an anonymous informant. We reverse on the ground that the anonymous tip lacked sufficient indicia of reliability. The investigatory stop was not constitutional, and the search of Defendant's person and seizure of the gun therefore violated Defendant's Fourth Amendment rights.

## I. BACKGROUND

{2} The material facts of this case are undisputed. Detective Palos (Detective), of the Las Cruces Police Department, testified that he received an anonymous page on the afternoon of February 28, 2002. The message contained a phone number, which the Detective called; an anonymous informant told him that there were two subjects in a blue vehicle at the corner of Alamo and Utah who were "acting rather suspicious[ly]" and were "possibly armed." The Detective believed that the page may have been the result of his previous assignment to a neighborhood police program, during which time he handed out business cards to encourage the public to contact him and report illegal activity in their neighborhood.

{3} In response to the anonymous tip, the Detective requested assistance, and Officer Rodriguez (Officer) responded. Both officers arrived on the scene, where they saw a blue parked car. Two men were out of the car and leaning against a wall that was inside the property line of the corner house. According to the Detective, the men were acting suspiciously because they were at a corner house, and in his experience, corner houses are common targets for burglaries

during the daytime. As both officers approached, they instructed the two men to keep their hands on the wall.

{4} While the Officer talked with the men, the Detective moved past them to check the corner house for signs of burglary, and at this point, he noticed that there was a "large bulge" in Defendant's pants pocket and that Defendant was awkwardly turning his hip toward the wall. The Detective proceeded to check the house, found no signs of burglary, and returned to where the men were standing.

{5} At that time, the Detective indicated to the Officer that they needed to do a pat-down search for officer safety. Before initiating the search, both officers asked the men if they were armed, and Defendant told them that he had a weapon in his pocket. Defendant was then instructed to put his hands on top of his head so that the Detective could safely reach into the pocket and retrieve the weapon. Defendant was carrying a 9 mm gun in a holster. The gun and holster were consistent with the bulge that the Detective observed earlier. Defendant was arrested and charged with the crime of possession of a firearm by a felon.

{6} Defendant moved to suppress evidence of the gun under the exclusionary rule on the ground that the officers did not have reasonable suspicion for the investigatory stop and thus violated Defendant's Fourth Amendment rights. The district court denied the motion to suppress and provided the following rationale for the decision: first, the Detective had experience receiving tips in this manner, and on many occasions, the tips had led to fruitful investigations of crimes; and second, when both officers arrived at the corner, they saw a blue car and two men as described in the tip. The district court viewed this as sufficient reason for the officers to approach the individuals and ask questions. When the officers did so, the Detective observed a bulge in Defendant's pocket, again matching the information provided, and saw Defendant suspiciously leaning against the wall as if he were trying to hide the bulge. In the district court's opinion, the bulge provided reasonable suspicion because it was against the law to carry a

concealed weapon. The district court stated that for safety reasons, the officers are trained to ask if there are weapons and to do a pat-down and that their search did reveal there was a loaded weapon.

{7} Following a denial of his motion to suppress, Defendant pled guilty to the charge and was convicted and sentenced. Additional pertinent facts are set out in our discussion of the issues.

## II. DISCUSSION

### A. Standard of Review

{8} On appeal from a district court's ruling on a motion to suppress, we determine whether the law was correctly applied to the facts. *State v. Cline*, 1998–NMCA–154, ¶ 6, 126 N.M. 77, 966 P.2d 785. Such a mixed question of law and facts is reviewed de novo, particularly when the question involves predominantly legal conclusions and constitutional rights. *State v. Attaway*, 117 N.M. 141, 145–46, 870 P.2d 103, 107–08 (1994). The reasonableness of a search and seizure under the Fourth Amendment is such a question. *State v. Martinez*, 94 N.M. 436, 440, 612 P.2d 228, 232 (1980). The facts in this case are not in dispute; we therefore review only the legal conclusions of the district court in denying Defendant's motion to suppress.

### B. Police–Citizen Encounter

{9} The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. U.S. Const. amend. IV. The New Mexico Constitution also protects against unreasonable searches and seizures. N.M. Const. art. II, § 10. However, because Defendant does not argue that the New Mexico Constitution affords him greater protection than the United States Constitution does, we review his appeal only under the Fourth Amendment. *State v. Jason L.*, 2000–NMSC–018, ¶ 9, 129 N.M. 119, 2 P.3d 856 (stating because the "[d]efendant has not argued on appeal that the New Mexico Constitution affords him greater protection than that afforded under the United States Constitution[,]" the court would "review his claim ... only under the Fourth Amendment").

{10} Generally, there are three categories of stops under the Fourth Amendment:

> First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. Such brief, consensual exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures. Second, the police may seize citizens for brief, investigatory stops. This class of stops is not consensual, and such stops must be supported by reasonable suspicion. Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probable cause.

*Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir.1993) (internal quotation marks and citations omitted).

{11} New Mexico recognizes a fourth type of police-citizen encounter, a community caretaking encounter, which may or may not implicate the Fourth Amendment. *State v. Nemeth*, 2001–NMCA–029, ¶ 27, 130 N.M. 261, 23 P.3d 936. Under this doctrine, a Fourth Amendment exception may exist if an officer has a "reasonable and articulable belief, tested objectively, that a person is in need of immediate aid or assistance or protection from serious harm." *Id.* ¶ 37. Defendant argues that the district court erroneously based its decision on the community caretaking doctrine. The record indicates that the district court considered the initial encounter to be a consensual one and did not discuss the community caretaking exception. We will therefore evaluate the encounter to determine when it progressed from a consensual one to an investigatory stop requiring reasonable suspicion.

{12} Our analysis begins with a determination of when the officers "seized" Defendant for purposes of Fourth Amendment analysis. Law enforcement officers are free to "approach an individual, ask questions, and request identification without the encounter becoming a seizure under the Fourth Amendment." *State v. Walters*, 1997–NMCA–013, ¶ 18, 123 N.M. 88, 934 P.2d 282. "A police officer seizes a person for

purposes of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir.2002) (internal quotation marks and citations omitted).

{13} In the present case, testimony introduced at the suppression hearing showed that both officers approached the subjects and immediately told them to keep their hands on the wall. According to the Detective, this instruction was given for safety purposes because officers are trained to keep a suspect's hands in view always. Nothing in the record indicates that Defendant failed to comply with this order; therefore, we assume that he submitted to the officers' authority. A seizure requires either the "use of physical force" by an officer "or submission by the individual" to the officer's assertion of authority. *Id.* When "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see United States v. Person*, 134 F.Supp.2d 517, 523 n. 1 (E.D.N.Y.2001) (emphasizing that asking, no matter how politely, a defendant to raise his hands and stand implicates the Fourth Amendment). A reasonable person would not feel free to leave under the circumstances of this case; thus, Fourth Amendment protections applied at the moment Defendant complied with the officers' order to keep his hands on the wall. *See State v. Richards*, 351 N.J.Super. 289, 798 A.2d 136, 142 n. 6 (Ct.App.Div.2002) (explaining that a field inquiry escalated into a *Terry* stop when a defendant was asked to place his hands on the patrol car).

## C. Reasonable Suspicion

{14} Defendant argues that the officers lacked reasonable suspicion to stop and detain him and that under the exclusionary rule, any evidence seized during the illegal search must be suppressed. We agree. The police may make an investigatory stop in circumstances that do not rise to the level of probable cause for an arrest if they have a reasonable suspicion that the law has been or is being violated. *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868; *State v. Flores*, 1996–NMCA–059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. *Terry* created a two-prong test for the reasonableness of an investigatory detention and weapons search. *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir.2004). A court must first decide "whether the detention was 'justified at its inception.'" *Id.* (internal quotation marks and citations omitted). The State "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the [sic] intrusion.'" *Id.* (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868); *see Flores*, 1996–NMCA–059, ¶ 7, 122 N.M. 84, 920 P.2d 1038 ("Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts."). Such facts must show that the defendant has committed or is about to commit a crime. *Johnson*, 364 F.3d at 1189. "Second, the officer's actions must be reasonably related in scope to the circumstances [that] justified the interference in the first place." *Id.* (internal quotation marks and citations omitted). In both prongs, the reasonableness of an officer's suspicion "is judged by an objective standard" that takes into account the totality of the circumstances and all information available to the officer at that time. *Id.* (internal quotation marks and citation omitted).

{15} As discussed above, Defendant was detained, and not free to leave, when he complied with the officers' order to keep his hands on the wall. At that time, the officers' suspicion that he was carrying a weapon was based solely on the information obtained from the anonymous tip. As a general rule, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{16} There are, however, situations in which a corroborated anonymous tip can have sufficient indicia of reliability to furnish reasonable suspicion for making an investigatory stop. *See White*, 496 U.S. at 330–31, 110 S.Ct. 2412. In *White*, the U.S. Supreme Court found that an important indicator of

the reliability of an anonymous tip is that it contains a range of details relating to the future actions of third parties that would not ordinarily be easily predictable. *Id.* at 332, 110 S.Ct. 2412. Although the Court described *White* as a "close case," it held that the anonymous tip in that case was reliable because significant aspects of the caller's predictions were corroborated by police investigation and, thus, there was reason to believe that the caller was honest and sufficiently informed to justify the stop. *Id.* Similarly, this Court in *Flores* found an anonymous tip to be reliable when police corroborated significant predictive aspects of the tip, including "the description of the vehicles, the direction of travel, and the time of arrival at the described destination." 1996–NMCA–059, ¶ 9, 122 N.M. 84, 920 P.2d 1038. We described that case as a "close call." *Id.* ¶ 10.

{17} In *State v. Bedolla,* 111 N.M. 448, 451–52, 806 P.2d 588, 591–92 (Ct.App.1991), this Court was persuaded that the balance lay on the other side of the line defined in *White* and *Flores* and held that the lack of corroboration of predictive detail invalidated a stop based on an anonymous tip. In *Bedolla,* the tip alleged that two men were dealing cocaine from a room in a particular motel and described the truck that they were driving. 111 N.M. at 452, 806 P.2d at 592. The police only corroborated that the truck arrived at the motel with three adults and that it later departed with two adults, while two others left in a second truck. *Id.* The tip alleged criminal activity yet lacked predictive detail and was not sufficiently corroborated by the police before the stop for them to form reasonable suspicion. *Id.* at 451, 806 P.2d at 591.

{18} The U.S. Supreme Court has subsequently clarified the level of predictive detail that an anonymous tip must contain to justify reasonable suspicion for a *Terry* stop. *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). In *J.L.,* the Court analyzed the reliability of an anonymous tip predicting that a young black man would be standing at a particular bus stop, wearing a plaid shirt, and carrying a gun. *Id.* at 268, 120 S.Ct. 1375. The officers arrived at the

bus stop and saw three black males "just hanging out[,]" and one of them was wearing a plaid shirt. *Id.* (internal quotation marks and citation omitted). The Court noted that besides the tip, the officers "had no reason to suspect any of the three of illegal conduct." *Id.* The officers did not see a gun, and J.L. did not make any threatening or unusual movements. *Id.* One of the officers told J.L. to put his hands on the bus stop, proceeded to frisk him, and seized a gun from his pocket. *Id.*

{19} The Court, in upholding a lower court decision that the search was invalid, stated that an anonymous tip that a person is carrying a firearm is not in itself sufficient to justify a police officer's stop and frisk of that person. *Id.* at 274, 120 S.Ct. 1375. The Court clarified that under those circumstances, an anonymous tip must have some predictive information to allow the police to verify the informant's knowledge or credibility. *Id.* at 271, 120 S.Ct. 1375. The "unknown, unaccountable informant ... neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* The fact that a gun was found did not mean that the officers had a "reasonable basis for suspecting J.L. of engaging in unlawful conduct." *Id.*

{20} The tip in *J.L.,* which provided an "accurate description of a subject's readily observable location and appearance[,]" did not "show that the tipster [had] knowledge of concealed criminal activity." *Id.* at 272, 120 S.Ct. 1375. To form the basis of reasonable suspicion, a tip must be "reliable in its assertion of illegality" and not just in its ability to identify a specific person. *Id.* The Court therefore held that when an "officer's authority to make [an] initial stop is at issue[,]" an anonymous tip that lacks sufficient indicia of reliability "does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274, 120 S.Ct. 1375.

{21} Here, Defendant asserts that *J.L.* is the controlling case in this matter and that the facts are more analogous to those in *Bedolla* than to those in *Flores.* This Court recently addressed the *J.L.* holdings in a case where an anonymous caller described a

vehicle that was being driven erratically and thus presented an imminent threat to the public. *State v. Contreras*, 2003–NMCA–129, ¶ 21, 134 N.M. 503, 79 P.3d 1111. The anonymous tipster called 911 and informed the police "of a possible drunk driver who was driving a grey van, towing a red Geo, and driving erratically." *Id.* ¶ 2. The patrol officers found and stopped the vehicle but had not observed the erratic driving themselves prior to the stop. *Id.*

{22} In analyzing the totality of circumstances in *Contreras*, we found that reasonable suspicion existed for the stop. *Id.* ¶ 21. Even in light of *J.L.*, the facts "allow[ed an] inference that the anonymous caller was a reliable concerned motorist; the information given was detailed enough for the deputies to find the vehicle in question and confirm the description; and the caller was an apparent eyewitness to the erratic driving." *Contreras*, 2003–NMCA–129, ¶ 21, 134 N.M. 503, 79 P.3d 1111. We weighed the potential "threat of drunk driving to the safety of the public with [the d]efendant's right to be free from unreasonable seizure." *Id.* ¶ 13. Furthermore, "a moving car on a public roadway present[ed] an exigent circumstance that a possessory crime [did] not." *Id.* ¶ 15 (citing *United States v. Wheat*, 278 F.3d 722, 736–37 (8th Cir.2001) (observing that the critical distinction between gun possession cases and potential drunk driving cases is that in the latter case, an officer cannot initiate a consensual encounter and cannot observe the suspect for a considerable length of time because an erratic and possible drunk driver poses an imminent threat to public safety)). We also observed that the brief stop of a vehicle is "less intrusive than the pat-down search at issue in *J.L.*" *Contreras*, 2003–NMCA–129, ¶ 16, 134 N.M. 503, 79 P.3d 1111.

{23} Applying the principles in *Contreras*, we find that the present case is virtually identical to *J.L.* Here, the anonymous tip provided a location, the color of the car, and a statement that the subjects may possibly be armed. As in *J.L.*, the tip contained no predictive information that would allow the officers to judge the informant's knowledge or credibility. The characteristics that it described were readily observable by anyone, and there was no information as to how the informant might have obtained inside information or knowledge about the gun. In fact, the assertion about the gun was vague at best. The officers failed to establish reasonable suspicion independently before seizing Defendant.

{24} The State argues that *J.L.* is distinguishable because in this case, the subjects were standing on private property in a high crime area, the officers observed a bulge in Defendant's pocket, and Defendant's behavior was suspicious. We are not persuaded that reasonable suspicion was developed from the facts that Defendant was leaning against a wall at a corner house in an area where such houses were often targets for burglary. When the officers arrived at the scene, they had no way of knowing whether the house belonged to Defendant or whether he had permission to be on that property. In fact, testimony indicated that the house may have been owned by a relative of one of the men. When asked why the tipster thought Defendant looked suspicious, the Detective stated, "Why this person said they looked suspicious, I can't say." The Detective also agreed that the stop was initiated based on the suspicion generated from the tip and not from "officer suspicion." With regard to the pocket bulge and Defendant's suspicious behavior, these observations took place after Defendant was seized and thus play no part in determining whether the officers had reasonable suspicion to stop and detain Defendant.

{25} We find that the pat-down search of Defendant on a public corner was an intrusive form of seizure. There was no exigency that precluded the officers from engaging in a consensual encounter that would have allowed time to develop reasonable suspicion. As in *J.L.* and *Bedolla*, the anonymous tip that formed the officers' basis for this investigatory stop lacked sufficient indicia of reliability to form reasonable suspicion. The gun, as evidence seized during an illegal stop, must be excluded. Holding that the initial stop was unwarranted, we do not need to reach Defendant's additional argument that the pat-down was illegal.

## III. CONCLUSION

{26} Because the anonymous tip lacked sufficient indicia of reliability and the investigatory stop therefore violated Defendant's constitutional rights, we reverse the district court's denial of the motion to suppress.

{27} **IT IS SO ORDERED.**

BUSTAMANTE and ROBINSON, JJ., concur.